[No. G023366. Fourth Dist., Div. Three. Mar. 21, 2002.]

HARRY W. LOW, as Insurance Commissioner, etc., Plaintiff and Appellant, v.
LIN W. LAN, Defendant and Respondent.

## COUNSEL

Daniel E. Lungren and Bill Lockyer, Attorneys General, David S. Chaney, Thomas G. Heller and Joseph M. O'Heron, Deputy Attorneys General, for Plaintiff and Appellant.

Callahan & Blaine and Jim P. Mahacek for Defendant and Respondent.

## OPINION

## SILLS, P. J.—

### I. INTRODUCTION

When an insurance company becomes insolvent, the Insurance Code authorizes the liquidator (who is usually the state Insurance Commissioner) to bring an action to recover any money that was paid to a creditor of the company within four months of the filing of the petition for liquidation, if the payment had the effect of putting the creditor in a better position than another creditor "of the same class" in the liquidation. (Ins. Code, § 1034.)[1] This case requires us to ascertain four separate questions concerning time periods which govern such "preference actions":

(1) How long is the statute of limitations? The very nature of preference actions under section 1034—which involves bona fide payments to creditors, not fraudulent transfers—means that the three-year statute for liabilities created by statute *other than* penalties or forfeitures should apply. (See former Code Civ. Proc., § 338, subd. 1, now Code Civ. Proc., § 338, subd. (a).) Preference actions under section 1034 are not penal in nature, but remedial.

---

[1]Because the complaint in this case was filed in 1996 we use the 1995 (current) version of Insurance Code section 1034. (See Stats. 1995, ch. 580, § 6.) Here is the pertinent text of the statute:

"(a) A preference is a transfer of any of the property of the person proceeded against [i.e., the insurer] to or for the benefit of a creditor, for or on account of an antecedent debt, made or suffered by the person proceeded against within one year before the filing of a petition for liquidation pursuant to Section 1016 [which provides for insurance commissioner to apply to the court for a liquidation order if it appears to the commissioner that continuing with the conduct of the business of the insurer would be futile], the effect of which transfer may be to enable the creditor to obtain a greater percentage of this debt than another creditor of the same class [note: the classes are listed in Ins. Code, § 1033] would receive. . . . [¶] . . . [¶]

"(c) Any preference may be avoided by the liquidator if any of the following is applicable:

"(1) The transfer was made within four months before the filing of the petition."

All further statutory references, unless otherwise specified, are to the Insurance Code.

(2) When does the statute of limitations begin to run on a preference action under section 1034? Both the plain text of the statute and analogous law in bankruptcy show that the statute of limitations begins to run when the liquidation petition is filed. Only then is the liquidator able to institute a preference claim. Indeed, a preference action cannot even exist until there is a liquidation petition, so there is no way that a statute of limitations could start running until the filing of that petition.

(3) For purposes of the four-month period during which any transfers of property to a creditor of an insurer may become the target of a preference action, does the "transfer" occur when the transaction giving rise to the transfer occurs, or when the actual transfer is made? Because the statute treats "transfers" and "transactions" differently, and again in light of analogous bankruptcy law, the answer is the date of actual transfer, not the date on which the transaction giving rise to that transfer takes place.

(4) For purposes of the requirement that any "antecedent debt" on which a preference may be based must be "made or suffered" before "one year before the filing of a petition for liquidation," does a tort claim create an antecedent debt at the time the tort was allegedly committed, or when it is settled or results in a court judgment? Because liability on tort claims is only established after settlement or judgment, a tort claim does not give rise to an antecedent debt until settlement or judgment.

Our answers to these questions mandate reversal of the trial court's judgment, which was predicated on the statute of limitations having run on the preference claim of the Insurance Commissioner (Commissioner) against Lin W. Lan, a former executive of Western International Insurance Company. Lan's own claim against her former employer was actually paid just barely within four months of the Commissioner's filing a petition for liquidation, even though that claim was settled a little more than four months before the Commissioner's filing.

## II. Facts

Lan was ousted from her post as president of Western International Insurance Company in 1987. She then sued the company for wrongful termination and related causes of action. She sought large damages for emotional distress. Her suit was settled in April 1992 for $2.35 million. The money was paid "in settlement of damages for Lan's claims of emotional distress and consequent physical manifestations of injury arising from [Western's] alleged acts of defamation, slander and libel."

The settlement agreement recited that it "was made and entered into on April 3, 1992," and provided that Western would pay Lan the money "before

April 13, 1992." The actual payment was made on April 8, 1992. That is, on that day a cashier's check was drawn on Western's account, given to Lan, and she cashed it.

Then came the Los Angeles riots of May 1992.[2] Western apparently insured a large number of businesses in the riot stricken area, and could not meet its claims. The Commissioner filed an application for an order appointing a conservator for Western on August 5, 1992. Lan was not named as a defendant.

Some two years later, on August 18, 1994, the Commissioner filed an application for an order to show cause (OSC), naming Lan as a defendant and seeking an order voiding the payment to Lan as a "preference."

Then followed a detour to the appellate court, when, before the hearing on the Commissioner's OSC scheduled for September 20, Lan filed a motion to disqualify the trial judge pursuant to section 170.6 of the Code of Civil Procedure. The motion was denied and Lan filed a petition for writ of mandate in response.

Lan's application for a stay of trial court proceedings pending further order of the appellate court was granted in an order filed November 8, 1994. The order was short, consisting of two sentences. The first sentence said that Lan's application for a stay was granted. The second sentence said, "All trial court proceedings are stayed pending further order of this court."

Our opinion was filed April 10, 1995.[3] The opinion became final as to the Court of Appeal May 10 (see Cal. Rules of Court, rule 24(a)). The remittitur was issued June 14, 1995.

In January 1996, Lan demurred to the still-pending OSC on the ground that the Commissioner had no power to seek assets from a third party by way of such a summary proceeding. (See generally *Kinder v. Superior Court* (1978) 78 Cal.App.3d 574, 579-581 [144 Cal.Rptr. 291] [Commissioner had no power to utilize OSC to recover sums paid agent of insolvent insurer].) On February 13, 1996, while the demurrer was still pending, the Commissioner filed an "amended complaint voiding preference and for judgment directing turn over of funds."

---

[2]At oral argument counsel for the Commissioner requested that we use the politically charged euphemism "uprising" to describe what happened, alluding that our word choice might have some significance in related litigation. No way. We are not about to dignify the rioting and looting that occurred in Los Angeles in May 1992 as an "uprising."

[3]Justice Sonenshine's opinion discharged the alternative writ and dismissed the petition as moot, since the challenged trial judge had been reassigned to another department. It did not, however, address the stay then in existence.

In a summary judgment motion decided April 1, 1998, the trial court determined that the Commissioner's preference claim against Lan was untimely for two reasons:

(1) The "transaction" that the Commissioner sought to void did not occur within four months of the filing for an order of liquidation (cf. § 1034)[4] because the settlement was entered into April 3 and the liquidation order was filed August 5; and

(2) The "settlement and transfer" (early Apr. 1992) occurred more than three years before the filing of the amended complaint (Feb. 13, 1996), and did not relate back to the OSC filed August 18, 1994.

. The Commissioner has timely appealed from the ensuing judgment.

### III. DISCUSSION

#### A. *Background Principles*

■ Insurance companies are not eligible to be debtors under federal bankruptcy laws. (11 U.S.C. § 109(b).) When an insurer becomes insolvent it becomes subject to orderly liquidation under state law. (See *Garamendi v. Executive Life Ins. Co.* (1993) 17 Cal.App.4th 504, 514 [21 Cal.Rptr.2d 578] [Congress made a "policy declaration . . . that the primary regulation of the business of insurance be in the states, not in the national government"].)

However, in dealing with problems related to insurer insolvencies, California courts may properly look to federal bankruptcy law for instructive analysis. (See *Webster v. Superior Court* (1988) 46 Cal.3d 338, 349, fn. 8 [250 Cal.Rptr. 268, 758 P.2d 596]; *Garamendi v. Executive Life Ins. Co., supra,* 17 Cal.App.4th at p. 516.)

One thing both systems have in common is preference actions. Any system of law dealing with insolvencies must necessarily make some provision for "preferences," that is, money paid to creditors on the eve of a bankruptcy (or, in the case of insurers, of an insolvency petition) which puts those creditors in a better position than they would be in if the money hadn't been paid and they had to take their chances in the bankruptcy or liquidation along with all the other creditors. (See generally McCoid, *Bankruptcy,*

---

[4]While the 1992 version of section 1034 differs in wording from the current version, both versions made transfers of property occurring within four months of the Commissioner's liquidation petition voidable by the liquidator.

*Preferences, and Efficiency: An Expression of Doubt* (1981) 67 Va. L.Rev. 249, 249, 259-260.)[5]

■ It is important to recognize that preference actions brought by an insurance liquidator under section 1034 do not involve any implication of bad conduct. As Justice Wallin pointed out, in contrasting California's insurance insolvency scheme with Texas's, our state does not require any intent that a creditor receive a preference over other creditors, or any knowledge on the creditor's part that it is being given a preference. (See *In re Title U.S.A. Ins. Corp.* (1995) 36 Cal.App.4th 363, 371 [42 Cal.Rptr.2d 498].)

■ Bankruptcy preference law, like section 1034 governing state insurance liquidations, may involve transactions that are made completely in good faith. True, the origins of preference actions in bankruptcy court may be traced to early decisions of the English courts centered around fraudulent transfers. But American bankruptcy law has evolved into a system of strict liability for transfers within a certain period, regardless of the good faith of the transaction. (See McCoid, *Bankruptcy, Preferences, and Efficiency: An Expression of Doubt, supra,* 67 Va. L.Rev. at p. 259 ["Preference law has thus moved from a notion of debtor fraud to a standard of absolute liability for a limited period for preferred creditors."].)[6]

■ The nature of preference actions entails two separate important time frames. The first is the time period which *defines* what a preference is. Under the federal bankruptcy law, transfers of the debtor's property within 90 days

---

[5]Professor McCoid explains: "So long as a debtor is solvent, every creditor can expect to be paid in full, and each may act independently without affecting others. There is generally no occasion for collective action. Once the debtor is insolvent, however, payment of one creditor necessarily prejudices others because there are insufficient assets to satisfy all. Bankruptcy, a collective claim enforcement proceeding, appears in the law in response to this kind of potential prejudice. From the creditor's standpoint, bankruptcy's principal theme is equality, or ratable distribution of the debtor's assets, among unsecured creditors . . . . [¶] Equal treatment of creditors is the oldest and most frequently advanced goal of preference law. Preference law tries to impose equality on prebankruptcy behavior so that the behavior will not make the principle of equality in bankruptcy distribution meaningless." (McCoid, *Bankruptcy, Preferences, and Efficiency: An Expression of Doubt, supra,* 67 Va. L.Rev. at pp. 259-260, fns. omitted.)

[6]See also Ponoroff and Ashby, *Desperate Time and Desperate Measures: The Troubled State of the Ordinary Course of Business Defense—And What to Do About It* (1997) 72 Wash. L.Rev. 5, 12-13. Writing about the 1978 elimination of the requirement that a creditor have reason to know of the debtor's insolvency at the time of the transfer, they state: "With this shift in emphasis, contemporary preference law shrugged off the last of its historical ties to the concept of fraud and fraudulent conveyances. The essence of modern preference law is no longer in the preferring, *but in the consequences of being preferred.*" (Italics added, fn. omitted.)

of the filing of the bankruptcy petition may be preferences, recoverable by the trustee. (11 U.S.C. § 547(b).) California insurance insolvency law, as it relates to good faith transfers, makes the definitional time period "within four months before the filing of the petition." (§ 1034, subd. (c)(1).)[7]

· ·

The second time period lies on the other side of the petition for liquidation, i.e., the time within which the trustee in bankruptcy or the liquidator of an insurance company has to bring a preference action. In federal bankruptcy law, it is, at the risk of some overgeneralization, two years from the filing of the petition. (11 U.S.C. § 546(a)(1).)[8] However, the California preference statute applying to good faith transfers, section 1034, does not contain any statute of limitations. And so we now address that problem.

### B. The Three-year Statute of Limitations Governs Preference Claims Under Section 1034

In the absence of a specified statute of limitations for preference claims under section 1034,[9] two possibilities present themselves from the Code of Civil Procedure: A one-year statute (Code Civ. Proc., § 340, subd. (1)) for statutory penalties or forfeitures, or the three-year statute (presently

---

[7]There is, in fact, a different statute (§ 1034.1) for payments made by the insurer involving a bad motive, that is, which are made or incurred "without fair consideration, or with actual intent to hinder, delay, or defraud either existing or future creditors" of the insurer. That statute has a much longer reach back into time as far as defining a preference that may be voided by the liquidator—one year as distinct from four months. There is no assertion in this case, for example, that Lan's receipt of $2.35 million was without fair consideration, and so section 1034.1 is not relevant.

[8]The question of the precise intricacies of the federal bankruptcy statute governing the statute of limitations for preference actions is beyond the scope of this opinion. Suffice to say: Before the 1994 amendments to 11 United States Code section 546(a), the statute was straightforward. The time limit was "two years after the appointment of a trustee." Because the statute made no reference to debtors in possession, the question of the statute of limitations when there was a debtor in possession was a hot topic in the federal courts. (Compare, e.g., *Gleischman Sumner v. King, Weiser, Edelman & Bazar* (7th Cir. 1995) 69 F.3d 799 [two-year statute of limitations applied only to trustees] with *Zilkha Energy Co. v. Leighton* (10th Cir. 1990) 920 F.2d 1520 [two-year statute of limitations applied universally].) Congress amended 11 United States Code section 546(a)(1) in 1994, to make the two years commence with the "order for relief," with a one-year statute of limitations after the appointment or election of the first trustee if a trustee is appointed within the two-year period. Congress intended the 1994 amendments merely to clarify that the two-year statute was to apply both to debtors in possession as well as trustees. (See *In re CompuAdd Corp.* (5th Cir. 1998) 137 F.3d 880, 884.)

[9]In section 1034.1 which generally governs *bad faith* preferences, there is a designated statute of limitations that applies *just* to transactions between insurers and reinsurers. The last paragraph of section 1034.1, under subdivision (d), reads: "The commissioner may avoid the transaction at any time within two years after the effective date of the transaction. If the transaction is so avoided, the parties shall be returned to their respective position as if the

Code Civ. Proc., § 338, subd. (a)) for actions on liabilities created by statute *other than* penalties or forfeitures. The Commissioner won this particular battle before the trial court, which held that the proper statute was the three-year statute. Lan argues on appeal that the one-year statute is the more appropriate one. There is no doubt that any liability Lan might incur from the Commissioner's preference claim is statutory and not a matter of common law.

The one-year statute of limitations, including that contemplating "forfeitures," is directed to claims of a *penal* nature. As this court explained in *Prudential Home Mortgage Co. v. Superior Court* (1998) 66 Cal.App.4th 1236, 1242 [78 Cal.Rptr.2d 566], the one-year statute set out in section 340, subdivision (1) of the Code of Civil Procedure involves situations where "an individual is allowed to recover against a *wrong-doer*, as a satisfaction for the wrong or injury suffered, and without reference to the actual damage sustained, or [where there is] . . . *punishment* for some act which is in the nature of a public wrong." (*County of Los Angeles v. Ballerino* (1893) 99 Cal. 593, 596, italics added.)

Of course, a preference action arising out of a good faith transaction may seem like a forfeiture. One day a creditor has money, quite lawfully, the next day the creditor must give it back (and get less or nothing as a result of the liquidation). However, a preference action is still *not* a "forfeiture" as the term has been construed for purposes of the one-year statute.

■ "[F]orfeiture is a penal concept." (*Ojavan Investors, Inc. v. California Coastal Com.* (1997) 54 Cal.App.4th 373, 392 [62 Cal.Rptr.2d 803], citing Black's Law Dict. (6th ed. 1990) at p. 650, col. 1.) The word is typically used in a "criminal context." (*Ojavan Investors, Inc., supra*, 54 Cal.App.4th at p. 393.) Currently the most common examples of "forfeitures" involve property used in illegal drug dealing. Such forfeitures are very "penal" indeed.

■ By the same token, our Supreme Court has held that statutory recoveries that were "not penal but remedial in nature" were *not* within the purview of the one-year statute for penalties and forfeitures. (See *Willcox v. Edwards* (1912) 162 Cal. 455, 463-464 [123 P. 276].)

---

transaction had not occurred, and the commissioner may enforce the reinsurance contract as it existed prior to the transfer."

No other statute of limitations appears in section 1034.1 and the text just quoted clearly refers only to reinsurance transactions. Because the present case does not involve transactions within the purview of section 1034.1, much less transactions made with a reinsurer, we need not speculate as to the effects of the special statute of limitations in section 1034.1 subdivision (d).

As we have explained above, preference claims under section 1034 control bona fide payments by insurers to their creditors made in good faith. There is no moral stigma to being the object of a preference claim under section 1034. The operative test is merely whether one is better off than like creditors who were unlucky enough not to be paid within the four months preceding the liquidation petition. We therefore conclude that the applicable statute is the three-year statute, section 338, subdivision (a) of the Code of Civil Procedure.

Our conclusion is confirmed by application of the three-year statute in cases which most resemble this one, i.e., where there was a claim, under some statutory theory, for recovery of funds otherwise acquired by the defendant in good faith. (E.g., *Blue Cross of Northern California v. Cory* (1981) 120 Cal.App.3d 723, 743 [174 Cal.Rptr. 901] [state Controller sought money held by insurer resulting from unnegotiated checks paid by insurer]; *County of Marin v. Messner* (1941) 44 Cal.App.2d 577, 591 [112 P.2d 731] [action to recover expenses paid to county surveyor without legal authority].)[10]

## C. *The Statute of Limitations Commences to Run with the Filing of the Liquidation Petition*

█ At the outset, we must acknowledge the obvious: It is counterintuitive to have a statute of limitations begin to run at some point later than the date of the transaction giving rise to the claim. Then again, as every civil litigator knows, there are times when precisely that happens, as when a "discovery" rule is appropriate. (For a handy summary of discovery rule jurisprudence, see Justice Rylaarsdam's dissent in *Prudential Home Mortgage Co. v. Superior Court, supra,* 66 Cal.App.4th at pages 1251-1254.)

If there is any one fundamental idea that dominates the interpretation of statutes of limitations, though, it is that they cannot begin to run until the claimant has the right to sue somebody on the claim, i.e., until the cause of action has "accrued." (See Code Civ. Proc., § 312 ["Civil actions, without

---

[10]Even cases where there was a possibility of treble damages have been held to fall under the three-year statute, as distinct from the one-year statute, where the treble damages were discretionary with the court. (See *Holland v. Nelson* (1970) 5 Cal.App.3d 308, 312 [85 Cal.Rptr. 117] [action against dance studio under Dance Act governed by three-year statute even though treble damages were awarded plaintiff because "option of granting judgment for treble damages" was "not to be construed as converting the statutory right of action into one for penal damages"]; *Mitchell v. Leslie* (1995) 39 Cal.App.4th Supp. 7, 11-12 [46 Cal.Rptr.2d 419] [because trial court not required to award treble damages for excess rents sought under rent control ordinance, one-year statute did not apply]; cf. *Menefee v. Ostawari* (1991) 228 Cal.App.3d 239, 244 [278 Cal.Rptr. 805] [dicta acknowledging that optional treble damages made one-year statute inapplicable].)

exception, can only be commenced within the periods prescribed in this title, after the cause of action shall have accrued, unless where, in special cases, a different limitation is prescribed by statute."]; *Romano v. Rockwell Internat., Inc.* (1996) 14 Cal.4th 479, 487 [59 Cal.Rptr.2d 20, 926 P.2d 1114] ["The applicable statute of limitations does not begin to run until the cause of action accrues, that is, ' "until the party owning it is entitled to begin and prosecute an action thereon." ' "].)

It is impossible for the Commissioner to bring a preference action until a liquidation petition is filed. A preference doesn't *exist* until the liquidation petition is filed. It is the filing of the liquidation petition that is the benchmark used to *define* those transactions that section 1034 considers preferences. The only way to apply the statute consistent with its text is to conclude that no preference claim accrues until the filing of the petition. Otherwise, you have the completely illogical result that a statute of limitations could begin to run on a claim that hadn't yet come into existence.

We need only add that federal bankruptcy law is, of course, analogous. As noted above, the two-year statute of limitations on preference claims in bankruptcy does not begin to accrue until the filing of the bankruptcy petition at the earliest. (See 11 U.S.C. § 546(a)(1).)

D. *The Date of the Transfer Is the Date of Actual Receipt of the Property, Not the Date of the Transaction Giving Rise to the Receipt of the Property*

■ We must now address an issue that involves the running of time, but is not, strictly speaking, a statute of limitations question. Rather, it involves the *definition* of a preference claim under section 1034, subdivision (c)(1). It arises because Lan's settlement with the insurer took place on April 3—outside of "four months before the filing of the petition" on August 5—but she was actually paid on April 8, which was within the period of four months before the petition.

The simple answer is that the statute uses the word "transfer," not "transaction" in the key phrase in section 1034, subdivision (c): It reads, "The transfer was made within four months before the filing of the petition," not "The transaction was made . . . ."

The slightly more elaborate answer is that section 1034 treats the words "transfer" and "transaction" differently and emphasizes that difference in the overall text. The last sentence in the first paragraph of subdivision (a) of section 1034 ("The following transactions *shall be among* those that may be considered a preference" (italics added)) clearly shows that "transfers" are a subset of the class of things called "transactions."

Case law indicating that the date of a "transaction" is the date an agreement was made, not the date the actual check was delivered, is therefore inapposite. For purposes of section 1034, we care about *transfers of property*, not *transactions giving rise* to transfers of property.

It is the same in bankruptcy, where a preference is defined in terms of the transfer of property 90 days before the filing of a petition. *Barnhill v. Johnson* (1992) 503 U.S. 393 [112 S.Ct. 1386, 118 L.Ed.2d 39] is on point.

In *Barnhill*, the debtor (or more precisely, the soon-to-be debtor in bankruptcy) delivered a check to pay a bona fide debt on November 18—a date outside of 90 days before the date of the bankruptcy petition. The check was honored by the bank on November 20—the 90th day before the bankruptcy petition. (See *Barnhill v. Johnson, supra,* 503 U.S. at p. 395 [112 S.Ct. at p. 1388].)

So when did the transfer of property occur? Answer: November 20, not November 18. The federal high court reasoned that the check might have bounced, the funds in the account been subjected to a lien, or the check even mistakenly not been honored. (*Barnhill v. Johnson, supra,* 503 U.S. at p. 399 [112 S.Ct. at p. 1390].) The salient fact was that the debtor retained full control over the disposition of the checking account until the check was honored. (*Id.* at p. 401 [112 S.Ct. at p. 1391].) The debtor could, for example, even have stopped payment in the intervening time period. Therefore there was no "transfer of funds" until the creditor actually received the money on November 20. (*Ibid.*)

To the same effect, except even closer to the present case, are *In re Allegheny* (Bankr. W.D.Pa. 1988) 86 B.R. 466 (date of transfer was not date of settlement of the lawsuit, but date of actual payment) and *In re Chesapeake Associates, Ltd. Partnership* (Bankr. D.Kan. 1992) 141 B.R. 737 (date of transfer after settlement of claim was not date of settlement or even delivery of checks to debtor's counsel in payment of settlement, but date creditor negotiated check from debtor's attorney's trust account).

E. *Under Section 1034, "Antecedent Debts" Arising out of Tort Claims Are Made When the Claim Is Settled or Judgment Is Rendered on It, Not When the Tort Occurred*

 A related issue that Lan presents regarding the definitional viability of a preference claim against her is whether Western's debt to her was made within one year of the filing of a petition. The argument is based on the first sentence of section 1034, subdivision (a), which defines a preference this way: "A preference is a transfer of any of the property of the person

proceeded against [i.e., the insurer] to or for the benefit of a creditor, for or on account of an antecedent debt, *made or suffered by the person proceeded against within one year before the filing of a petition for liquidation . . . ."* (Italics added.) Thus a viable preference claim must not only involve a transfer of property within four months of the petition date, it must also involve a debt that was "made or suffered" within one year of the petition date.

In this particular case, Lan argues that her "debt" arose in 1987 when she was removed from office. Her theory is that as a "tort victim" she became an instant creditor of the company in 1987, and therefore there was no transfer of property on account of an antecedent debt within one year of the petition in 1992.

■■■ The Insurance Code does not specifically define "debt." In common law, the word debt has "no fixed meaning and must be construed within the context in which it is used." (*Kizer v. Hanna* (1989) 48 Cal.3d 1, 10 [255 Cal.Rptr. 412, 767 P.2d 679].)

In bankruptcy law, "debt" means "liability on a claim." (*Ohio v. Kovacs* (1985) 469 U.S. 274, 278 [105 S.Ct. 705, 707, 83 L.Ed.2d 649].) It is not the mere existence of a claim.

■■■ Western did not incur any *liability* on Lan's claims until the settlement of April 1992. Claims and liability on claims are two different things, particularly when the claim is based in tort.

Anybody with the money for a filing fee can file a tort claim, particularly one based on emotional distress. Lan's "instant creditor" theory of tort liability is unrealistic because it fails to account for frivolous, marginal, or defensible tort claims. To use one extreme example: Suppose a plaintiff were to sue an insurance company for intentional infliction of emotional distress based on the emotional angst he felt when an agent, taking an application, gave him a dirty look. Under Lan's theory, the plaintiff became an instant creditor of the bank when the agent gave the look. That is a patently absurd result.[11]

Clearly, any rule that would render the definition of the words "antecedent debt" under section 1034 synonymous with an alleged tortious act stretches the word "debt" beyond the breaking point. (Basically, it confuses "debt"

---

[11]We use the example of the dirty look tort as one that most readers would probably agree was frivolous. Readers who entertain the idea that dirty looks might be tortious may substitute their own example of a clearly frivolous tort claim.

with "claim.") In the case of meritless (not to say frivolous) claims, the result should be, in the ordinary course of things, that the plaintiff will end up owing the defendant money—at least by way of costs in the aftermath of a defense judgment. That outcome is wholly incompatible with Lan's theory of what a debt is. This is not to say that Lan's own tort claim against Western was frivolous or even meritless. But until settlement or judgment, it is impossible to say that a given claim will result in any money owing to the would-be creditor.

### F. Application of the Rules to This Case: The Commissioner's Claim Was Timely

The preference claim was viable because the "transfer" of Western's property—some $2.35 million—did not occur until April 8, 1992, which was within four months of the date of the liquidation petition filed on August 5, 1992. The "antecedent debt" that gave rise to the transfer was "made" on April 3, when a real legal obligation was created, not just a "claim." And that was within one year of the filing of the petition.

The three-year statute of limitations began to run on August 5, 1992. However, the stay order plainly said "*all* trial court proceedings" (italics added) were stayed as of November 8, 1994, pending further order of this court.

There is no question that our stay order would have prevented the Commissioner from filing a complaint of any kind against Lan. For one thing, the language of the stay order was all-encompassing.

For another, Lan had sought the stay in the first place because of a dispute over the disqualification of the trial judge, and the purpose of the stay would have been thwarted had the Commissioner been allowed to file a complaint against Lan. (Cf. *In re Marriage of Varner* (1998) 68 Cal.App.4th 932, 936 [80 Cal.Rptr.2d 628] [purpose of stay during appeal is to prevent trial court from rendering appeal futile by conducting proceedings that could alter or affect matter before appellate court].) That judge would have been assigned the case, as any ensuing order would have been part of the liquidation proceedings. (See § 1016 [empowering court to make such orders in liquidation proceeding as to "wind up the business" of the insolvent insurer].)

There was thus nothing the Commissioner could have done in the trial court during the period of the stay to prosecute its preference claim against Lan, including filing a complaint against Lan, amended or otherwise. The earliest opportunity the Commissioner had to file such a complaint was when

this court issued the remittitur on June 14, 1995—a period of slightly more than seven months. During that seven-month period the statute of limitations on the preference claim was therefore tolled. (See *County of Santa Clara v. Hayes Co.* (1954) 43 Cal.2d 615, 618 [275 P.2d 456] [" 'It is well recognized that the running of the statute of limitations is suspended during any period in which the plaintiff is legally prevented from taking action to protect his rights.' "].)

With the seven additional months, the Commissioner had until early March 1996 to file a complaint against Lan. Because the so-called amended complaint was filed February 13, 1996, it was timely as an *original* complaint. We therefore do not need to deal with the very thorny question of whether a so-called amended complaint may "relate back" to an OSC as distinct from an original complaint.[12]

## IV. DISPOSITION

The trial court should not have granted summary judgment in favor of Lan. The Commissioner's preference claim was timely.

The next question is whether the Commissioner deserves summary judgment on this record. No. This case does not necessarily turn entirely on Lan's time-bar defenses. For example, in the portion of her respondent's brief opposing the commissioner's request for summary judgment on appeal, Lan argues that there is evidence that she really was a third party claimant under a Western insurance policy. That is, she was a claimant in the same way that someone who was injured in a slip-and-fall accident on premises owned by a policyholder of Western's was a claimant. She was not a "creditor" in the sense that a vendor who delivered photocopy paper to Western's head office was a creditor. Perhaps. In any event, it is a matter that will obviously require some further factual exploration beyond the record before us. Thus our opinion is therefore without prejudice to either party on any issues other than those specifically relating to Lan's time-bar arguments considered here.

The judgment in favor of Lan is reversed. Because reversal of a summary judgment is substantively an interlocutory proceeding, we do not award

---

[12]There is a real question as to whether the Commissioner has the power to proceed by OSC, as distinct from complaint, in a preference action. (Compare *Maloney v. Rhode Island Ins. Co.* (1953) 115 Cal.App.2d 238, 249-251 [251 P.2d 1027] [upholding summary procedure] with *Kinder v. Superior Court, supra,* 78 Cal.App.3d 574, 581 [observing that summary process deprived object of preference action of "important rights to which it would be entitled in an independent action"].) Because the Commissioner here filed the amended complaint in the nick of time, we are spared the need to delve into whether the OSC procedure was proper. We will observe, however, that after *Kinder,* the Commissioner would be well advised to use complaints rather than OSC's.

appellate costs in this appeal. Rather, the trial judge shall have discretion to award the appellate costs from this appeal to the ultimately prevailing party.

Bedsworth, J., and Aronson, J., concurred.

Respondent's petition for review by the Supreme Court was denied June 12, 2002.