[No. D039816. Fourth Dist., Div. One. Aug. 3, 2004.]

DENNIS GOEHRING et al., Plaintiffs and Appellants, v.
CHAPMAN UNIVERSITY, Defendant and Appellant.

**COUNSEL**

Law Offices of Kevin O'Connell & Associates and Kevin O'Connell for Plaintiff and Appellant Dennis Goehring.

Quinn Emanuel Urquhart Oliver & Hedges, Steven G. Madison and Roxanna A. Manuel for Plaintiffs and Appellants Stephen Mann and Raelyn Yeomans.

Rutan & Tucker, Duke F. Wahlquist and Jane Taylor Kacer for Defendant and Appellant.

## OPINION

**McCONNELL, P. J.**—This case arises from misrepresentations Chapman University (Chapman) made to plaintiffs, students in the inaugural class of its law school, and its violations of Business and Professions Code section 6061, which requires written disclosures of facts pertinent to a law school's unaccredited status. We hold as matters of first impression that Business and Professions Code section 6061 (1) confers a private right of action for the refund of tuition from an unaccredited law school that violates written disclosure requirements; (2) is not subject to the exhaustion of administrative remedies doctrine; (3) requires written disclosures each semester, or preceding any payment of any tuition or fee other than an application fee; (4) does not unjustly enrich students who obtain refunds of tuition and continue in school; and (5) is governed by the one-year limitations period for actions on a statute for a penalty or forfeiture (Code Civ. Proc., § 340, subd. (a) [former subd. (1)]). We also conclude that to any extent doctrines of substantial compliance and waiver may apply to Business and Professions Code section 6061, they are inapplicable here.

Further, we conclude substantial evidence supports the jury's findings that plaintiffs Stephen Mann and Raelyn Yeomans did not prove the damages element of their fraud cause of action, and the trial court properly granted Chapman summary adjudication of plaintiff Dennis Goehring's fraud and related causes of action because as a matter of law he cannot prove the damages element of the claims. We affirm the judgment in all aspects.

## FACTUAL AND PROCEDURAL BACKGROUND

A brief legal discussion is required to put the facts in context. California law schools are either accredited or unaccredited. An accredited law school has been granted accreditation by the Committee of Bar Examiners of the State Bar of California (the Committee), based on a variety of factors demonstrating it offers a sound legal education and complies with applicable provisions of the Business and Professions Code and other laws. (Rules Regulating Accreditation of Law Schools in Cal. (Accreditation Rules), rule one, §§ 1.04(A), 1.05.) Generally, the Committee deems accredited a law school either provisionally or fully approved by the American Bar Association (ABA). (*Id.,* § 1.06.)

To be eligible to sit for the California bar examination, students in an unaccredited law school must attend a minimum of four years of law school, 270 or more hours per year, and pass the First Year Law Student's Examination (FYLSX). (Bus. & Prof. Code, § 6060, subds. (e)(2)(A) & (h)(1).)[1] In contrast, students in an accredited law school are exempt from the FYLSX (Bus. & Prof. Code, § 6060, subd. (h)(2)), and at the relevant time could sit for the bar examination after three years of full-time study (former Bus. & Prof. Code, § 6060, subd. (e)(1)).[2] Further, at the relevant time the State Bar gave a student in an unaccredited law school no credit for the first year of study until he or she passed the FYLSX, and absent a showing of good cause no credit for any subsequent study undertaken before he or she passed the FYLSX. (Former Bus. & Prof. Code, § 6060, subd. (g); Historical and Statutory Notes, 3B pt. 3 West's Ann. Bus. & Prof. Code (2003 ed.) foll. § 6060, p. 80.)[3]

In July 1994, in anticipation of opening a law school in 1995, Chapman sought accreditation from the Committee.[4] In an internal memorandum Chapman stated that without accreditation it would attract "only the very worst of students," because the FYLSX had a low passage rate and was "dreaded." The Committee deferred Chapman's request pending the receipt of additional information and cautioned that it ordinarily takes seven years to become accredited.

Nonetheless, in January 1995 Chapman published a newsletter for prospective students predicting approval under rule XVIII of the Committee's Admission Rules "at the earliest possible time, which is September 1, 1995," and advising the approval would exempt students from the FYLSX requirement. The Committee notified Chapman the newsletter was misleading

---

[1] Business and Professions Code section 6060 contains exceptions to the requirement of four years of law school attendance, but they are not relevant here. (Bus. & Prof. Code, § 6060, subd. (e)(2)(B)–(E).) The FYLSX is commonly referred to as the "Baby Bar Examination." (*Bib'le v. Committee of Bar Examiners* (1980) 26 Cal.3d 548, 553 [162 Cal.Rptr. 426, 606 P.2d 733].)

[2] Currently, Business and Professions Code section 6060 does not specify the number of years students in accredited law schools must attend before being eligible to sit for the bar examination. (Bus. & Prof. Code, § 6060, subd. (e)(1).)

[3] Effective January 1, 1997, subdivision (h)(1) of Business and Professions Code section 6060 provides: "Those who pass the [FYLSX] within its first three administrations upon becoming eligible to take the examination shall receive credit for all law studies completed to the time the examination is passed. Those who do not pass the examination within its first three administrations upon becoming eligible to take the examination, but who subsequently pass the examination, shall receive credit for one year of legal study only."

[4] At that time, rule XVIII of the Committee's Rules Regulating Admission to Practice Law in California (Admission Rules) set forth the procedures for law school accreditation. In January 1996 the Accreditation Rules superseded Admission Rules, rule XVIII. (Accreditation Rules, rule one, § 1.03.)

because early preliminary approval under rule XVIII was "very unlikely to occur," and in any event, students in a school preliminarily approved under rule XVIII were not exempt from the FYLSX requirement. Chapman did not heed the Committee's suggestion it correct the newsletter.

Chapman's catalog for the 1995–1996 academic year notified prospective students of the FYLSX requirement and stated that it expected, but did not guarantee, it would have ABA approval by 1997. However, Chapman did not disclose the four-year rule. Rather, it offered a three-year program and implied that even if the school remained unaccredited students could sit for the California bar examination after completing three years of study. Before Chapman published the catalog, the Committee reminded it of the four-year rule, and the effect of unaccreditation on students not passing the FYLSX.

Chapman opened an unaccredited law school in August 1995, with a founding class of approximately 200 students, including Goehring, Mann and Yeomans. The Committee advised Chapman it should disclose that if it did not obtain preliminary approval from the ABA as projected, students would be required to take the FYLSX and pass it to get credit for their studies. However, Chapman made no such disclosure.

To the contrary, during the spring 1996 semester, Chapman's president informed students that under an "exemption" the State Bar would allow students failing the FYLSX to continue their studies and obtain full credit for them, and Chapman was seeking a ruling from the State Bar making the FYLSX voluntary for its students. Further, Chapman's dean told students that although they had to take the FYLSX, the State Bar waived the requirement they had to pass it to sit for the bar examination, or had made the FYLSX advisory only because of Chapman's special status.

Chapman's inaugural class took the FYLSX in June 1996, and the passage rate was only 13.7 percent. Students began to learn about the four-year rule because the State Bar notified students who did pass the examination that they were required to attend three additional years of classes before sitting for the bar examination. In response to students' complaints, Chapman's dean said it did not inform students of the four-year rule because the State Bar never enforced it.

Chapman's catalog for the 1996–1997 academic year continued to offer a three-year program, and stated that by agreement with the Committee students who did not pass the FYLSX could continue their studies and may be allowed to sit for the bar examination. The State Bar complained to Chapman of misstatements in the catalog and denied having any agreement with it pertaining to the FYLSX.

In January 1997 the ABA rejected Chapman's application for provisional approval. Noting students' undergraduate grade point averages, Law School Aptitude Test (LSAT) scores and the passage rate on the FYLSX, the ABA explained its "most serious concern . . . was the quality of the student body and the apparent weakness of the School's academic standards." The ABA also commented on the faculty's " 'lax approach' to academic grading," evidenced by the lack of mandatory academic dismissals until the end of the third semester and the failure to take specific steps to address academic standards.

Chapman initially refused to let students review the ABA's letter, and told them it was "extremely pleased with the positive feedback" and "in the ballpark of ABA approval." However, in May 1997 the ABA denied Chapman's request for reconsideration.[5]

In June 1997 Chapman, under new leadership and pursuant to the State Bar's direction, finally disclosed the requirement that students in unaccredited law schools attend four years of classes, and with the exception of the first year, they would receive no credit for classes taken before passing the FYLSX. Further, Chapman released the ABA's January and May 1997 letters denying it approval.

Responding to students' displeasure, Chapman offered to refund all tuition paid by inaugural students who elected by September 1997 to withdraw from school. For continuing students, Chapman offered, contingent on its not receiving accreditation by the end of the spring 1998 semester, a 50 percent reduction in tuition through spring 1998 and free or reduced tuition for classes taken after 1998 to meet the four-year requirement. However, a student could qualify only by signing a waiver of all claims against Chapman.

Goehring, Mann and Yeomans, who all failed the FYLSX, rejected Chapman's refund offer. Mann withdrew from school and Yeomans took a one-year leave of absence, citing financial reasons. Goehring continued in school until January 1998 when Chapman dismissed him for academic reasons. Yeomans returned to Chapman for a third year of study and graduated in May 1999, after it attained preliminary approval from the ABA.

Goehring, Mann and Yeomans separately sued Chapman for fraud and related causes of action, and the court consolidated their cases.[6] In a fourth amended complaint, Mann alleged that in enrolling and reenrolling in law

---

[5] The ABA did grant Chapman provisional approval in February 1998 and full approval in August 2002.

[6] The court included the actions of numerous other students in the consolidation, but these appeals involve only Goehring, Mann and Yeomans.

school he relied on numerous written and oral misrepresentations of Chapman regarding the quality of its faculty, the admission of only applicants showing a genuine aptitude for the study of law, the construction of a "state-of-the art" law school facility by 1997, the prediction of attaining early State Bar accreditation or ABA approval, students' ability to continue in school despite failing the FYLSX and to sit for the California bar examination after only three years of study, and negotiations with the State Bar to make the FYLSX voluntary. Mann also alleged he withdrew from Chapman when he learned of the misrepresentations because "he lost all trust and confidence" in the school.

The fraud allegations of Yeomans's third amended complaint were substantively identical to those of Mann's fourth amended complaint. Goehring's sixth amended complaint alleged fewer incidents of fraud, and concentrated on statements regarding the prediction of obtaining ABA approval, the necessity of only three years of study, the State Bar's agreement that students failing the FYLSX could continue their studies, and the unimportance of the FYLSX results because of a waiver from the State Bar.

Plaintiffs also sought the return of tuition under Business and Professions Code section 6061, which requires unaccredited law schools to make specified written disclosures to students and provide them with signed copies of the statements as receipts for their payment of tuition. Further, plaintiffs alleged Chapman violated former Education Code section 94320, which prohibited private postsecondary educational institutions from making "false, deceptive, inaccurate, or misleading" statements in connection with the offering or publicizing of a course. (Former Ed. Code, § 94320, subd. (e).)

Chapman successfully moved for summary adjudication of Goehring's causes of action for fraud, negligence and violation of former Education Code section 94320, on the ground that since Chapman dismissed him for academic reasons he cannot establish a causal connection between its conduct and his damages. The court denied his motion for reconsideration, this court denied his petition for writ of mandate and the California Supreme Court denied his petition for review.

After a lengthy trial, the jury returned a special verdict finding Chapman knowingly and recklessly made false representations to the plaintiffs with the intent to defraud them, and they justifiably relied on the misrepresentations. The special verdict form, however, did not require the jury to specify the statements it found deceitful or any details regarding reliance. In any event, the jury found neither Mann nor Yeomans satisfied the damages element of their fraud claims. The jury also rejected their claims under former Education Code section 94320.

Before trial, the court ruled plaintiffs' claims for refunds of tuition and fees for the violation of Business and Professions Code section 6061 were subject to a one-year statute of limitations applicable to "actions on a statute for a penalty or forfeiture." (Code Civ. Proc., § 340, subd. (a).) After the presentation of evidence, the court directed a verdict for Goehring, Mann and Yeomans on their statutory claims in the amount of the tuition and fees they paid during the year preceding their actions. Judgment was entered on January 10, 2002.

## DISCUSSION

### I

### *Causation and Damages*

### A

### *Summary Adjudication*

Goehring contends the court erred by granting Chapman summary adjudication on his causes of action for intentional and negligent misrepresentation and violation of former Education Code section 94320 on the ground he cannot satisfy the damages element of the claims.[7]

"A party may move for summary adjudication as to one or more causes of action within an action . . . , if that party contends that the cause of action has no merit . . . ." (Code Civ. Proc., § 437c, subd. (f)(1).) On a summary adjudication, a defendant "meets its 'burden of showing that a cause of action has no merit if [it] has shown that one or more elements of the cause of action . . . cannot be established, or that there is a complete defense to that cause of action. . . .' " (*Marron v. Superior Court* (2003) 108 Cal.App.4th 1049, 1057 [134 Cal.Rptr.2d 358].) If the defendant meets its initial burden, the burden shifts to the plaintiff to "set forth the specific facts showing that a triable issue of material fact exists . . . ." (Code Civ. Proc., § 437c, subd. (p)(2).) A de novo standard of review applies. (*Marron v. Superior Court, supra,* at p. 1057.)

---

[7] We note Goehring has violated fundamental principles of appellate practice. He elected to provide an appellant's appendix in lieu of a clerk's transcript, but he submitted no record on appeal, and, in turn, submitted briefs without proper citations to the record. (See Cal. Rules of Court, rules 5.1, 14(a)(1)(A).) Although this has caused considerable inconvenience, and gives us grounds to dismiss the appeal (*Del Real v. City of Riverside* (2002) 95 Cal.App.4th 761, 768 [115 Cal.Rptr.2d 705]; *In re Marriage of Green* (1984) 159 Cal.App.3d 1163, 1164 [206 Cal.Rptr. 286]), we elect to consider it because Chapman submitted an adequate record.

A motion for summary adjudication is directed to the issues framed by the pleadings. (*Maria D. v. Westec Residential Security, Inc.* (2000) 85 Cal.App.4th 125, 132 [102 Cal.Rptr.2d 326].) Goehring alleged Chapman induced him to enroll and reenroll in law school through misrepresentations regarding its prospects for obtaining early State Bar accreditation under rule XVIII of the Admission Rules or ABA preliminary approval, students' ability to sit for the California bar examination after only three years of study, and the State Bar's supposed waivers of the four-year rule and FYLSX requirements. Further, he alleged Chapman led him to believe it was likely he would graduate from an ABA accredited law school in three years, but it dismissed him for academic reasons during the spring 1998 semester, and if he "is unable to return to [Chapman], all of his tuition money, expenses, and past, present and future lost time from work and employment opportunities will constitute his special damages."

" ' "The elements of fraud . . . are (a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or 'scienter'); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage." ' " (*Small v. Fritz Companies, Inc.* (2003) 30 Cal.4th 167, 173 [132 Cal.Rptr.2d 490, 65 P.3d 1255].) To recover for fraud, the plaintiff must prove " 'detriment proximately caused' by the defendant's tortious conduct. [Citation.] Deception without resulting loss is not actionable fraud. [Citation.] 'Whatever form it takes, the injury or damage must not only be distinctly alleged but its causal connection with the reliance on the representations must be shown.' " (*Service by Medallion, Inc. v. Clorox Co.* (1996) 44 Cal.App.4th 1807, 1818 [52 Cal.Rptr.2d 650]; see *Alliance Mortgage Co. v. Rothwell* (1995) 10 Cal.4th 1226, 1239–1240 [44 Cal.Rptr.2d 352, 900 P.2d 601]; Civ. Code, §§ 1709, 3333; 5 Witkin, Cal. Procedure (4th ed. 1997) Pleading, § 687, p. 147; BAJI No. 12.57.) "Damage to be subject to a proper award must be such as follows the act complained of as a legal certainty . . . ." (*Agnew v. Parks* (1959) 172 Cal.App.2d 756, 768 [343 P.2d 118].)

■ The tort of negligent misrepresentation does not require scienter or intent to defraud, but it does, of course, require a showing of resulting damage. (*Small v. Fritz Companies, Inc., supra,* 30 Cal.4th at p. 173; *Gagne v. Bertran* (1954) 43 Cal.2d 481, 487–488 [275 P.2d 15].) Additionally, damage is an element of recovery under former Education Code section 94320, subdivision (e). (Ed. Code, former § 94321, subd. (b).)

In support of its motion, Chapman submitted evidence that as of the 1997–1998 academic year it required students to maintain a minimum 2.0 grade point average to remain in good standing, and it dismissed Goehring on January 21, 1998, because his grade point average for the fall 1997 semester was 1.74 and his cumulative grade point average was 1.959. This evidence

shows Goehring's damages were not caused by the alleged misrepresentations that induced him to attend Chapman, but by his academic dismissal. Indeed, Goehring concedes that but for his dismissal, he "would have received his degree from an ABA-approved law school." "Assuming . . . a claimant's reliance on the actionable misrepresentation, no liability attaches if the damages sustained were otherwise inevitable or due to *unrelated causes*." (*Kruse v. Bank of America* (1988) 202 Cal.App.3d 38, 60 [248 Cal.Rptr. 217], italics added.)

Goehring asserts Chapman failed to meet its initial burden, and thus the burden did not shift to him to raise a triable issue of material fact. He submits Chapman "relied on the conclusory assertion that [he] was 'academically dismissed' from the school." To the contrary, Chapman submitted competent evidence it dismissed Goehring for academic reasons.

In opposition to the motion, Goehring submitted a declaration asserting Chapman wrongfully dismissed him because before he enrolled it guaranteed him one semester of probation if his grade point average fell below 2.0, and alternatively, Chapman manipulated his grades to appear lower than they actually were. Goehring stated that when he was dismissed he was "14 units short of the 88 units required to complete the J.D. degree," but because of the dismissal "I cannot transfer any of my units to another ABA law school, and even were I to start over again at another unaccredited law school, not one of my credits could transfer," and "[i]f I graduate from an unaccredited law school in California, I will not be able to return to my home state of New York and practice law."

■ Goehring asserts he raised triable issues of fact regarding whether he actually "flunked out," and the court improperly weighed the evidence on the reasons for his dismissal. However, his complaint was not based on wrongful dismissal, but on false representations that induced him to enroll and reenroll in Chapman.[8] He produced no evidence to support a finding he suffered damages as a result of relying on those misrepresentations, likely an insurmountable task given his academic dismissal. Contrary to Goehring's assertion, the fact that other plaintiffs proceeded to trial does not show he raised an issue of material fact requiring trial.

---

[8] Goehring applied in this case for a temporary restraining order requiring Chapman to readmit him. The court denied him any relief. He later filed a fourth amended complaint that included a claim for injunctive relief based on his dismissal. The trial court initially sustained Chapman's demurrer without leave to amend, but according to Chapman, it later granted Goehring leave to amend to "pursue [a] claim for wrongful dismissal by way of a petition for writ of administrative mandamus." Instead, Goehring filed a fifth amended complaint in which he included a claim for "equitable relief," again seeking an order requiring Chapman to readmit him. The court sustained Chapman's demurrer without leave to amend, and on appeal Goehring assigns no error to the court's ruling.

Goehring also asserts the court erred by finding the "benefit-of-the-bargain" measure of damages applied to his causes of action, and not the "out-of-pocket" measure of damages. (See *Alliance Mortgage Co. v. Rothwell, supra,* 10 Cal.4th at p. 1240; BAJI No. 12.57.) However, the measure of damages is immaterial because Chapman established as a matter of law that Goehring cannot show a causal nexus between his alleged reliance on misrepresentations and *any* damages. The court correctly found Chapman was entitled to summary adjudication.

## B

### *Sufficiency of Trial Evidence*

Mann and Yeomans challenge the sufficiency of the evidence to support the jury's findings they suffered no damages as a result of their reliance on Chapman's misrepresentations. "When findings of fact are challenged in a civil appeal, we are bound by the familiar principle that 'the power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted,' to support the findings below. [Citation.] We view the evidence most favorably to the prevailing party, giving it the benefit of every reasonable inference and resolving all conflicts in its favor. [Citation.] Substantial evidence is evidence of ponderable legal significance, reasonable, credible and of solid value. [Citation.] However, '[s]ubstantial evidence . . . is not synonymous with "any" evidence.' [Citation.] Instead, the evidence must be ' "substantial" proof of the essentials which the law requires.' " (*Oregel v. American Isuzu Motors, Inc.* (2001) 90 Cal.App.4th 1094, 1100 [109 Cal.Rptr.2d 583].)

### 1

### *Yeomans*

Yeomans testified that in the spring or summer of 1997 when she learned of Chapman's misrepresentations, she was concerned the law school was "going to shut down at some point." She "wanted to get out of the school" because it appeared Chapman would not receive accreditation, and thus she could not sit for the California bar examination without attending four years of classes and passing the FYLSX. Further, she realized that because she failed the FYLSX, and Chapman had no waiver of the requirement, the State Bar would not recognize her credits. Yeomans attributed her one-year leave of absence to Chapman's conduct, and claimed she was damaged by the delay in her graduation from 1998 to 1999.

In her petition for a leave of absence, Yeomans did not mention Chapman's conduct. Rather, she stated: "I am writing to inform you that I must petition

for a temporary leave of absence from school as a result of severe financial difficulties. By working more than full-time over the next year, I hope to put myself in a position where I am able to pay my current bills and save enough to complete my studies. [¶] The cost of attending law school . . . has been high and my studies have made it difficult for me to contribute to my family's household and living expenses. At this time, my financial situation has worsened partly due to a loss of transportation and my need for extensive dental work."

During her testimony, Yeomans conceded the statements in her petition were truthful. She also conceded she submitted the petition before the ABA rejected Chapman's request for reconsideration in May 1997, before she read the ABA's January 1997 rejection letter, and before she learned about the four-year rule. However, she testified she actually took a leave of absence because Chapman lied to her about being able to take the California bar examination after three years of study and having a waiver of the FYLSX requirement, but she did not mention those reasons because a professor told her "there could be nothing about accreditation in [her] petition."

Even if the jury accepted Yeomans's testimony, it could reasonably conclude her claimed damages for graduating a year later than planned were merely speculative. "Whatever the proper measure of damages may be, in a given case, the recovery therefor is still subject to the fundamental rule that damages which are speculative, remote, imaginary, contingent, or merely possible cannot serve as a legal basis for recovery." (*Frustuck v. City of Fairfax* (1963) 212 Cal.App.2d 345, 367–368 [28 Cal.Rptr. 357].)

Plaintiffs' expert economist, Tamorah Hunt, calculated that a year's delay in graduation caused Yeomans damages over her work life of between $129,695 and $321,014. Hunt based the calculation on the assumptions that Chapman's wrongdoing caused Yeomans's leave of absence, and if she had not taken leave she would have graduated in 1998 and passed the bar examination that summer on her first try. Hunt agreed that if any assumption were incorrect, her calculations were incorrect. Chapman's expert, Robert Trout, testified that if Hunt's assumptions were correct, Yeomans's damages were approximately $3,500.

However, Yeomans testified she failed the California bar examination in February 2000 and 2001, and skipped opportunities to take the examination in July 1999 and 2000, because she was unprepared, and in July 2001 so she could attend trial of this matter. Yeomans predicted she would pass the bar examination on a third try in February 2002, but that does not suggest that had she graduated in 1998 she would have immediately taken the bar examination and passed it. "[T]he opinion testimony of expert witnesses does

not constitute substantial evidence when it is based upon conclusions or assumptions not supported by evidence in the record." (*Hongsathavij v. Queen of Angels, etc. Medical Center* (1998) 62 Cal.App.4th 1123, 1137 [73 Cal.Rptr.2d 695].)

Regarding her emotional distress claim, Yeomans testified she visited a doctor once because she had an irregular heartbeat for several days. However, that occurred in January 1998, several months into her leave of absence from Chapman. Yeomans also testified she believed the year's delay in her legal education adversely affected her grades during her third year of study and her ability to pass the bar examination. She said that when she returned to Chapman her grades suffered because even though it had attained accreditation, she "didn't want to be there," "worried constantly," was unable to sleep, had trouble concentrating and "had a real distrust of people." She also said the leave of absence "had a huge effect on the amount of material I retained from my first and second year," and "[t]his whole experience has shaken [my] confidence in myself" and "really affected my self-esteem."

Yeomans asserts she was entitled to an award of damages because her testimony was uncontradicted. However, on cross-examination she testified that during her third year at Chapman she was a member of the law review, was active in the tax society and participated in social events such as a golf tournament and a graduation dinner. Further, Yeomans admitted she "really enjoyed" several of her classes and "particularly enjoyed" at least one class.

■ In any event, "[u]ncontradicted testimony in appellant's favor does not necessarily conclusively establish the pertinent factual matter: The trier of fact is free to *reject* any witness' uncontradicted testimony; and the court of appeal will affirm so long as the rejection was not arbitrary." (Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2003) ¶ 8:54, p. 8-21; see *Ortzman v. Van Der Waal* (1952) 114 Cal.App.2d 167, 170–171 [249 P.2d 846].) The jury "had the benefit of observing the demeanor of witnesses and [is] therefore in a better position than the appellate court to *assess credibility.*" (Eisenberg et al., *supra,* ¶ 8:41, p. 8-17.) In assessing the plaintiff's credibility, the jury may consider his or her interest in the case. (*Ortzman v. Van Der Waal, supra,* at p. 171.) We conclude substantial evidence supports the jury's finding that Yeomans suffered no compensable damages.

2

*Mann*

Mann testified that in June 1997 when Chapman disclosed the four-year rule and other matters, and revealed the ABA's January 1997 letter denying

its application for approval, he was "overwhelm[ed] . . . [by] not being able to figure out what to do," and although he "couldn't trust anything that anybody at Chapman said" he was reluctant to "give up the dream" of becoming a lawyer. He testified he ultimately decided to withdraw because he "lost confidence and trust in Chapman [and] in the administrators of the law school [because] I had just been lied to too many times."

Plaintiff's expert calculated Mann incurred $97,964 in damages, including "loss of earnings . . . during the period . . . he was attending Chapman, and . . . tuition plus accrued interest that he paid while attending Chapman." Mann also claimed moving expenses and emotional distress damages, manifested by headaches, stomachaches and decreased sexual relations with his wife. Chapman's expert, Trout, agreed with Hunt's calculation, if her assumption were correct, that Mann withdrew from law school because of its conduct.

The issue of why Mann withdrew from Chapman raises the reliance element, as well as the damage element, of his fraud claim. "Reliance exists when the misrepresentation or nondisclosure was an immediate cause of the plaintiff's conduct which altered his or her legal relations, and when without such misrepresentation or nondisclosure he or she would not, in all reasonable probability, have entered into the contract or other transaction." (*Alliance Mortgage Co. v. Rothwell, supra,* 10 Cal.4th at p. 1239.)

The jury returned a special verdict finding that plaintiffs relied on Chapman's fraudulent statements. However, the verdict form did not require the jury to specify the representations it found false, the identities of plaintiffs who relied on particular statements, or the nature of their reliance. In other words, the jury may have found a plaintiff relied on misrepresentations for some purposes, i.e., enrolling or reenrolling in law school, but not for others, i.e., leaving law school. " 'A judgment or order of the lower court is *presumed correct.* All intendments and presumptions are indulged to support it on matters as to which the record is silent, and error must be affirmatively shown. This is not only a general principle of appellate practice but an ingredient of the constitutional doctrine of reversible error.' " (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564 [86 Cal.Rptr. 65, 468 P.2d 193]; *In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1133 [275 Cal.Rptr. 797, 800 P.2d 1227].) Moreover, the appellant has the burden of affirmatively showing error by an adequate record. (9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 518, p. 562.) Because the evidence was undisputed that Mann suffered damages in some amount if Chapman caused him to withdraw from law school, but the jury awarded him no damages, we presume the jury found Mann withdrew for unrelated reasons and affirm the finding if it is supported by substantial evidence.

Notably, Mann conceded that in *April 1997* he leased space in an industrial complex in Fullerton for a furniture repair and refinishing business, the type of business he previously ran in Kansas. Mann also testified he could not fathom working while attending law school full time, and in any event Chapman discouraged students from working. Thus, the jury could reasonably infer that when Mann learned in June 1997 of Chapman's misrepresentations he had already decided to abandon his law studies.

Further, such an inference is supported by evidence of Mann's financial situation. Mann testified he wanted to avoid incurring student loans, and he initially intended to use his life savings for the first two years of law school. However, he took out an $8,700 student loan for his second semester tuition because it was "expensive to live in California," and it "was getting scary" because he and his wife "were going through money so fast." Additionally, he took out an $8,440 student loan for his third semester tuition. Further, Mann testified he withheld his tuition for the spring 1997 semester because he learned Chapman was required under Business and Professions Code section 6061 to make certain written disclosures and it failed to do so. However, Mann conceded his tuition was due by January 2, 1997, but he learned of the statutory disclosure requirement no earlier than January 27.

Additionally, Mann's grades had steadily declined, and his grade point average for the spring 1997 semester was 1.9 and his cumulative grade point average was 2.019. He conceded that before he withdrew he learned that in response to the ABA's criticisms Chapman adopted a mandatory grading curve and required students to maintain minimum grade point averages of 2.0. Mann admitted "there was some buzz around the school that people were upset about that because . . . marginal students might flunk out." Mann agreed he was a "marginal student," and if his grades went down .020 percent he would "flunk out."

Moreover, Mann supposedly withdrew because he feared Chapman would not receive ABA approval by his projected graduation date, but in his application to law school he wrote he was unconcerned with whether Chapman had ABA approval, and "[i]f I have to earn my J.D. from a mail order law school when I'm seventy-five years old, so be it." Mann was 45 years old when he applied to Chapman, and he performed poorly three times on the LSAT and was turned down by three accredited law schools in the Midwest.

It was the jury's province to assess Mann's credibility, and it presumably rejected his stated reason for withdrawing from Chapman. Substantial evidence supports a finding that Mann withdrew because he was in danger of academic dismissal and/or for financial reasons, and the withdrawal caused

the loss of his investment in the endeavor and his claimed damages. Further, the jury could reasonably find implausible Mann's emotional distress claims, including the claim that for about 12 to 18 months during law school he lost the desire to have sexual relations with his wife because he was upset by Chapman's delay in building a permanent law school facility.

## 3

### *Additional Contentions*

Mann and Yeomans cite *Shaw v. Hughes Aircraft Co.* (2000) 83 Cal.App.4th 1336 [100 Cal.Rptr.2d 446] (*Shaw*), in asserting they are entitled to a new trial because the jury compromised its verdict. In *Shaw* the plaintiff sued his former employer for breach of contract, breach of the implied covenant of good faith and fair dealing, and wrongful termination in violation of public policy, alleging the stated reason for the termination, his sexual harassment of coemployees, was pretextual and the real reason was retaliation for his whistleblowing activities. The jury found for the defense on the breach of contract claim, but awarded the plaintiff more than $400,000 for breach of the implied covenant. The jury also found in favor of the plaintiff on the wrongful discharge claim, but awarded him no damages. (*Id.* at p. 1341, fn. 4.)

The court held the jury's verdicts on the breach of contract and breach of implied covenant causes of action were irreconcilable, and both claims had to be retried. (*Shaw, supra,* 83 Cal.App.4th at p. 1344.) The court rejected Shaw's argument that instead of ordering a new trial it should sustain the jury's award on the implied covenant cause of action as damages for wrongful discharge. The court explained the jury's finding of wrongful discharge could not stand because "[w]hen the issue of liability is sharply contested, and the jury awards inadequate damages, the only reasonable conclusion is the jury compromised the issue of liability, and a new trial is required." (*Id.* at p. 1346.) The court found a clear inadequacy of damages on the wrongful termination cause of action because the defendant's own expert calculated Shaw's minimum loss at $200,000. Because of a possible compromise verdict, a new trial on *all* issues was required, as opposed to merely the damages issue. (*Ibid.*; see also *Wilson v. R. D. Werner Co.* (1980) 108 Cal.App.3d 878, 884 [166 Cal.Rptr. 797]; *Rose v. Melody Lane* (1952) 39 Cal.2d 481, 488–489 [247 P.2d 335] [when jury fails to compensate a plaintiff for damages *indicated by the evidence* only reasonable conclusion is that the jury compromised on liability issue and new trial limited to damages issue is improper].)

Here, in contrast to *Shaw*, the jury's findings that plaintiffs suffered no damages as a result of Chapman's wrongdoing are supported by substantial evidence. Accordingly, there is no cause for a new trial on any issue.

Additionally, Mann and Yeomans submit that because the jury found Chapman made intentional misrepresentations, its finding against them on their claim under former Education Code section 94320 is inconsistent. Again, that statute prohibited postsecondary educational institutions from making "false, deceptive, inaccurate, or misleading" statements in connection with the offering or publicizing of a course. (Former Ed. Code, § 94320, subd. (e).) Chapman counters that the jury could find its misrepresentations were not made in connection with the offering or publicizing of a course. "Inconsistent verdicts are ' "against the law," ' and the proper remedy is a new trial." (*Shaw, supra,* 83 Cal.App.4th at p. 1344.) We are not required to reach the issue, however, because damage is an essential element of a claim under that statute (see former Ed. Code, § 94321, subd. (b)), and the jury reasonably found that plaintiffs did not satisfy the damages element of their claims.

Mann and Yeomans also contend the court erred by ruling Chapman's failure to comply with the disclosure requirements of Business and Professions Code section 6061 was not actionable under former Education Code section 94321, which provided that "[n]otwithstanding any provision of the contract or agreement, a student may bring an action for a violation of this article *or for an institution's failure to perform its legal obligations . . . .*" (Former Ed. Code, § 94321, subd. (b), italics added.) Again, we do not address the issue because damage is an element of the claim (*ibid.*) and plaintiffs suffered no compensable damages.

Further, Mann and Yeomans assert Chapman's counsel, Jennifer Keller, "presented arguments filled with improper references to ethnicity, religion, and sex and painted a lurid picture of the plaintiffs as lazy, crazy, dissolute reprobates with their hands outstretched to reach into the Christian pockets of Chapman," and those "improper arguments, coupled with the fact that the jury's verdict was hopelessly inconsistent, show clearly that the verdict was compromised."

However, the jury's finding of no damages disposes of plaintiffs' inconsistency argument. Moreover, plaintiffs neither raise misconduct of counsel as a separate issue on appeal nor discuss legal authorities on the issue. (See Cal. Rules of Court, rule 14(a)(1)(B) [an appellant must "state each point under a *separate heading or subheading summarizing the point, and support each point by argument*"].)

In any event, we find no prejudicial error. " ' "It is only when the conduct of counsel consists of a willful or persistent effort to place before a jury clearly incompetent evidence, or the statements or remarks of counsel are of such a character as to manifest a design on his [or her] part to awake the resentment of the jury, to excite their prejudices or passions against the opposite party, or to enlist their sympathies in favor of his [or her] client or against the cause of his [or her] adversary, *and the instructions of the court to the jury to disregard such offered evidence or objectionable remarks of counsel could not serve to remove the effect or cure the evil, that prejudicial error is committed.*" ' " (*Dominguez v. Pantalone* (1989) 212 Cal.App.3d 201, 210–211 [260 Cal.Rptr. 431].)

Plaintiffs complain that Chapman's counsel questioned Mann "about his sex life." However, the questioning was proper because Mann claimed a decrease in sexual relations with his wife as an element of his damages.

Plaintiffs also claim that in closing argument Keller "taunted Yeomans, a woman of color, with the rhetorical question, 'How now, brown cow?' " In addressing Yeomans's claim that Chapman's conduct caused her to fail the bar examination, Keller stated: "How, now, brown cow? How is this Chapman's fault?" Yeomans's counsel objected "to that statement about Ms. Yeomans," and the court overruled the objection. As we recall, the phrase "How now, brown cow?" was one of numerous phrases used to teach elocution. Keller's use of the phrase is puzzling, and offensive if she were referring to Yeomans. However, the trial court presumably found Keller was not referring to Yeomans, but to lack of causation, and from this record we cannot say the court erred.

Keller did make several improper remarks about religion during closing argument. In addressing plaintiffs' claims they were damaged by Chapman's failure to build a permanent law school facility, Keller stated: "One of the . . . great teachers in the history of the world . . . didn't have any buildings, either. He was poor and people followed him and listened to what he had to say." Keller then stated, "When I was growing up, my mother used to say if our pastor talks about the building fund one more time, I am going to scream." Keller also said one of Chapman's professors wrote a book or hosted a Public Broadcasting Service series titled *The Search for God In America.* In a hearing outside the jury's presence, the court found the remarks improper and warned Keller to cease referring to religion. Plaintiffs rejected the court's offer to admonish the jury, thereby waiving appellate review of the issue. (*Sabella v. Southern Pac. Co.* (1969) 70 Cal.2d 311, 318 [74 Cal.Rptr. 534, 449 P.2d 750].) In any event, contrary to plaintiffs' assertion the references to religion did not "create[] an atmosphere of Christians versus pagans," and the impropriety does not merit a new trial.

Lastly, Mann and Yeomans assert that in finding against them on the damages issue "the jury must . . . have been affected by the events of September 11, 2001—as it turned out, the very morning the jury was to begin deliberations." They submit that although the court adjourned until the following day, "the jury's . . . uncertainty and concern for the future was at best a major distraction, and the losses suffered [September 11] unfairly but understandably trivialized less severe losses and injuries, even legally cognizable ones such as those suffered by plaintiffs at the hands of Chapman." Mann and Yeomans engage in speculation.

On September 12, before giving legal instructions, the court asked each juror "to reach down deep in your heart" to determine whether "the events of yesterday are lingering in your mind to the point where you think you would be really unable to concentrate and deliberate on this case." The court instructed the jurors to "think very carefully about that because . . . despite the tragic events of yesterday, these parties have a case that each of them deem to be very, very important," and it "would not be right if we were . . . to . . . ask you to deliberate if you felt that you were honestly in a frame of mind where you would find that difficult to do." The court asked any juror who felt he or she could not deliberate to raise a hand, and no juror did so. We presume the jury understood and followed the court's instructions. (*Housley v. Godinez* (1992) 4 Cal.App.4th 737, 747 [6 Cal.Rptr.2d 111].)

II

*Business and Professions Code Section 6061*

In its appeal, Chapman contends the court erred by determining that Business and Professions Code section 6061 (hereafter section 6061) creates a private right of action, or alternatively, that plaintiffs' claims for the refund of fees are barred by their failure to exhaust administrative remedies with the State Bar. Chapman also contends the statute requires only one written disclosure, when a student first matriculates, and continuing students are not entitled to additional disclosures. Further, Chapman asserts the refund of tuition to a student who continues in law school and benefits from the education is improper under unjust enrichment principles.

In their appeals, Goehring, Mann and Yeomans contend the trial court erred by determining their section 6061 claims are governed by the one-year statute of limitations for an "action upon a statute for a penalty or forfeiture." (Code of Civ. Proc., § 340, subd. (a).) Plaintiffs argue their claims are governed by the three-year limitations period for an "action upon a liability created by statute, other than a penalty or forfeiture." (*Id.*, § 338, subd. (a).) These are issues of first impression; indeed, no reported decision has discussed any aspect of section 6061.

A

*Private Right of Action*

1

We review matters of statutory interpretation independently. The question of whether a regulatory statute creates a private right of action depends on legislative intent. (*Moradi-Shalal v. Fireman's Fund Ins. Companies* (1988) 46 Cal.3d 287, 292, 304–305 [250 Cal.Rptr. 116, 758 P.2d 58] (*Moradi-Shalal*); *Crusader Ins. Co. v. Scottsdale Ins. Co.* (1997) 54 Cal.App.4th 121, 131, 135 [62 Cal.Rptr.2d 620] (*Crusader*).) In determining legislative intent, "[w]e first examine the words themselves because the statutory language is generally the most reliable indicator of legislative intent. [Citation.] The words of the statute should be given their ordinary and usual meaning and should be construed in their statutory context. [Citations.] These canons generally preclude judicial construction that renders part of the statute 'meaningless or inoperative.' " (*Hassan v. Mercy American River Hospital* (2003) 31 Cal.4th 709, 715–716 [3 Cal.Rptr.3d 623, 74 P.3d 726].)

Chapman relies on *Moradi-Shalal,* in which the Supreme Court, overruling its decision in *Royal Globe Ins. Co. v. Superior Court* (1979) 23 Cal.3d 880 [153 Cal.Rptr. 842, 592 P.2d 329] (*Royal Globe*), held that in enacting Insurance Code sections 790.03 and 790.09 the Legislature did not intend to create a private civil cause of action against an insurer committing one of the numerous acts set forth in Insurance Code sections 790.03, subdivision (h). The latter provision prohibits insurers from "[k]nowingly committing or performing *with such frequency as to indicate a general business practice*" certain unfair claims settlement practices, such as "[n]ot attempting in good faith to effectuate prompt, fair, and equitable settlements of claims in which liability has become reasonably clear." (Ins. Code, § 790.03, subd. (h)(5), italics added.)

The court relied on the dissent in *Royal Globe* (*Moradi-Shalal, supra,* 46 Cal.3d at p. 304), which concluded the "frequency" requirement of Insurance Code section 790.03, subdivision (h) unambiguously showed the Legislature had no intent to create a private right of action for a single or isolated act, and rather prohibited "acts were to be considered unfair practices subject to *administrative* [by the Insurance Commissioner] regulation and discipline and then only if committed with the requisite frequency." (*Royal Globe, supra,* 23 Cal.3d at pp. 895, 896 (conc. & dis. opn. of Richardson, J.).) The dissent in *Royal Globe* observed that had the Legislature intended to create a private right of action, "one would reasonably have expected that the Legislature simply would have directly imposed such liability in clear, understandable,

unmistakable terms, as it has done in numerous other statutes." (*Id.* at p. 896.) The dissent cited the Unfair Practices Act (Bus. & Prof. Code, § 17000 et seq.) which expressly provides that " '[a]ny person . . . may bring an action to enjoin and restrain any violation of this chapter and, in addition thereto, for the recovery of damages.' " (*Royal Globe, supra,* 23 Cal.3d at p. 896, quoting Bus. & Prof. Code, § 17070.)

The *Moradi-Shalal* court also reviewed the available legislative history and found the "fact that neither the Legislative Analyst nor the Legislative Counsel observed that the new act created a private right of action is a strong indication the Legislature never intended to create such a right of action." (*Moradi-Shalal, supra,* 46 Cal.3d at p. 300.) The court, however, noted its legislative intent analysis did not limit individual actions against insurers under common law theories such as fraud, infliction of emotional distress, breach of contract or breach of the implied covenant of good faith and fair dealing. (*Moradi-Shalal, supra,* 46 Cal.3d at pp. 304–305.)[9]

Chapman also relies on *Crusader, supra,* 54 Cal.App.4th 121, 133, in which the court interpreted *Moradi-Shalal* to mean that "when neither the language nor the history of a statute indicates an intent to create a new private right to sue, a party contending for judicial recognition of such a right bears a heavy, perhaps insurmountable, burden of persuasion." In *Crusader,* the issue was whether an admitted insurer had a private right of action under Insurance Code section 1763, which "prescribes the procedures . . . that must be followed by surplus line brokers in soliciting and placing insurance with nonadmitted insurers." (*Crusader, supra,* at p. 135.) The statute does not expressly provide for a private right of action, and based on the legislative history—which included testimony by a witness recommending that private parties be given a right to sue—the court found the Legislature had no intention of conferring such a right. Rather, the Legislature "increased regulatory procedures and created a 'surplus line advisory organization.' " (*Id.* at pp. 136.) The court also explained "an insured suffering a loss because of improper conduct by a broker in placing surplus line coverage" is not without a remedy because he or she "may pursue common law claims against that broker, which may include negligence, breach of contract, etc." (*Id.* at p. 134.)

---

[9] In *Industrial Indemnity Co. v. Superior Court* (1989) 209 Cal.App.3d 1093 [257 Cal.Rptr. 655], the court observed that for an insured, the holding of *Moradi-Shalal, supra,* 46 Cal.3d 287, "usually does not matter," because Insurance Code section 790.03, subdivision (h) "did not set new standards for insurance companies, but gave statutory expression to existing common law standards of decency toward the insured." (*Industrial Indemnity Co. v. Superior Court, supra,* at p. 1097; accord, *Zephyr Park v. Superior Court* (1989) 213 Cal.App.3d 833, 837 [262 Cal.Rptr. 106].)

Additionally, Chapman cites this court's opinion in *Schaefer v. Williams* (1993) 15 Cal.App.4th 1243 [19 Cal.Rptr.2d 212], for the proposition that "[s]urely, if the Legislature had intended to create . . . a private action, it would have done so by clear and direct language." (*Id.* at p. 1248.) In *Schaefer,* we held the Legislature did not intend to make enforceable through private action a political candidate's alleged violation of his voluntary pledge to abide by the Code of Fair Campaign Practices, and "inferred the Legislature believed that any enforcement of [that Code] would be obtained in the court of public opinion." (*Ibid.*) Moreover, we noted that "when the fair campaign statutes were enacted and when the Legislature revisited the issue five years later, it was the legislative intent that the legal remedy for defamation in the course of a campaign was a private action for libel or slander." (*Ibid.*)

2

Section 6061, a provision of the State Bar Act (Bus. & Prof. Code, § 6000 et seq.), requires any unaccredited law school to "provide every student with a disclosure statement, subsequent to the payment of any application fee but prior to the payment of any registration fee," containing certain information, such as its unaccredited status; the school's assets and liabilities; the number and percentage of students who have taken and who have passed the FYLSX and the final bar examination in a specified period; the number of legal volumes in the library; the educational background, qualifications and experience of the faculty; the ratio of faculty to students; whether the school has applied for accreditation and the status of any application; and, that the education it provides may not satisfy requirements of other states for the practice of law. (§ 6061, subds. (a)–(h).)

Section 6061 also provides: "The disclosure statement required by this section shall be signed by each student, who shall receive as a receipt a copy of his or her signed disclosure statement. If any school does not comply with these requirements, it *shall make a full refund of all fees paid by students.* [¶] Subject to approval by the board, the [Committee] may adopt such reasonable rules and regulations as are necessary for the purpose of ensuring compliance with this section." (§ 6061, subd. (h), italics added.)

Chapman asserts there is nothing in the language of section 6061 indicating the Legislature intended to confer a private right of action. However, Chapman ignores the statute's mandate that a law school failing to make proper written disclosures *refund* students' fees. (§ 6061, subd. (h).) In contrast, the statutes at issue in *Moradi-Shalal, Crusader* and *Shaefer* did not expressly entitle individuals to a refund or any other type of payment for violation of the statute. Since in enacting section 6061 the Legislature

unquestionably intended to bestow students or former students with individual monetary claims, it must have intended to give them private rights of action to pursue such claims. In our view, section 6061's refund language explicitly denotes a private right of action. In any event, "*Moradi-Shalal* did not hold that courts should never imply a private right of action." (*Jacobellis v. State Farm Fire and Casualty Co.* (9th Cir. 1997) 120 F.3d 171, 174.)

Moreover, in *Moradi-Shalal* the court based its holding in part on adverse consequences and analytical difficulties caused by *Royal Globe*. For instance, commentators pointed out "the undesirable social and economic effects of the decision (i.e., multiple litigation, unwarranted bad faith claims, coercive settlements, excessive jury awards, and escalating insurance, legal and other 'transaction' costs)." (*Moradi-Shalal, supra,* 46 Cal.3d at p. 299.) Further, it is difficult to ascertain "the means by which the plaintiff must prove a 'pattern' or 'general business practice' of unfair settlement practices" under Insurance Code section 790.03, subdivision (h). (*Moradi-Shalal, supra,* at p. 303.) The court noted "the plaintiffs in these cases (whether insureds or third party claimants) seldom have the ability to prove any widespread pattern of wrongful settlement practices on the part of the insurer." (*Ibid.*) In contrast, section 6061 succinctly sets forth disclosure requirements and a law school's compliance or noncompliance is readily ascertainable.

The *Moradi-Shalal* court also relied on alternative means of enforcement. Under the Unfair Practices Act the Insurance Commissioner may issue cease and desist orders for violations of Insurance Code section 790.03 (Ins. Code, § 790.05). Willful violation of such orders may result in a maximum fine of $55,000, and repeated violations may result in the suspension of the insurer's license for up to one year. (*Id.,* § 790.07.)

Chapman submits that similarly, a private right of action under section 6061 is unnecessary because the State Bar is authorized to enforce the statute. Section 6061 states the Committee "*may* adopt such reasonable rules and regulations as are necessary for the purpose of ensuring compliance with this section." (§ 6061, subd. (h), italics added.) Neither section 6061 nor the Committee's rules promulgated thereunder sets forth any procedure for the pursuit of students' individual refund claims.

Chapman relies on rule one, section 1.09 of the Accreditation Rules, but it undercuts Chapman's position. Section 1.09 provides: "Complaints received from law school students regarding particular law schools shall be associated with the Committee's file for the school, but the *Committee shall not act on any one complaint,* except to review it in the context of

the school's compliance with the Admission Rules, Standards or Rules. *The Committee shall not intercede in matters between a law school and a student.*" (Italics added.)

Additionally, Chapman relies on rule XX of the Admission Rules, which states at section 4 that if the Committee determines a law school's disclosure statement was incomplete or inaccurate, or that it did not supply each student with a complete and accurate disclosure statement, the Committee will direct it to correct the statement, advise students of the changes, and offer them a refund of tuition. Section 5 of rule XX provides the failure to comply with the Committee's direction "shall be considered as *grounds for removing the school from the list of schools registered with the Committee* and the Committee will recommend to the Board of Governors such action as in the opinion of the Committee is necessary or desirable to obtain compliance." (Italics added.)

Admission Rules rule XX does not authorize the Committee to award students refunds of tuition, or require it to pursue refunds for them. Although the Committee may conduct evidentiary hearings (Bus. & Prof. Code, § 6049), it appears that at best its interest in seeking compliance with the refund provision of section 6061 is discretionary. Chapman asserts that is immaterial because the Committee's "ability to deregister an unaccredited law school and thus put the school out of business is more than sufficient to ensure compliance" with the Committee's directions regarding section 6061.[10] However, the Legislature included a refund provision in section 6061, presumably to encourage compliance with disclosure requirements, and Chapman's theory essentially renders that provision nugatory. We must "avoid treating any portion of a legislative enactment as surplusage." (*Cabrini Villas Homeowners Assn. v. Haghverdian* (2003) 111 Cal.App.4th 683, 691 [4 Cal.Rptr.3d 192].)

Chapman also asserts the lack of evidence in section 6061's legislative history of an intent to create a private right of action shows the Legislature lacked such intent. We are unconvinced, given the express refund provision of section 6061. Moreover, the fact that in enacting section 6061 in 1986 the Legislature transferred regulatory authority over written disclosure requirements from the Superintendent of Public Instruction and the Attorney General (see Ed. Code, former §§ 29090, 29093, 94360; and see § 94362) to the State Bar does not show the Legislature invested it with the exclusive authority to handle refund disputes, or that it is equipped to handle such disputes. We conclude that in mandating individual refunds for the violation of section 6061, the Legislature intended to confer a private right of action.

---

[10] An unaccredited law school must register with the Committee and fulfill other requirements. (Cal. Rules of Court, rule 957(b).)

## B

### *Exhaustion of Administrative Remedies*

We are also unpersuaded by Chapman's contention that refund claims under section 6061 are subject to the exhaustion of administrative remedies doctrine.

"A failure to exhaust administrative remedies is a fundamental defect." (*Lopez v. Civil Service Com.* (1991) 232 Cal.App.3d 307, 311 [283 Cal.Rptr. 447].) "The claim or 'cause of action' is within the special jurisdiction of the administrative tribunal, and the courts may act only to *review* the final administrative determination. If a court allowed a suit to be maintained prior to final administrative determination, it would be interfering with the subject matter jurisdiction of another tribunal. Accordingly, the exhaustion of an administrative remedy has been held *jurisdictional* in California." (3 Witkin, Cal. Procedure (4th ed. 1996) Actions, § 308, p. 392; see *Lance Camper Manufacturing Corp. v. Republic Indemnity Co.* (1996) 44 Cal.App.4th 194, 199 [51 Cal.Rptr.2d 622].) The exhaustion doctrine applies to remedies created by statute (*Rojo v. Kliger* (1990) 52 Cal.3d 65, 83 [276 Cal.Rptr. 130, 801 P.2d 373]) or created "by a *rule* of an administrative agency that has the force and effect of a statute." (3 Witkin, Cal. Procedure, *supra*, Actions, § 309, p. 396.)

However, the "exhaustion requirement is not applicable where an effective administrative remedy is wholly lacking." (3 Witkin, Cal. Procedure, *supra*, Actions, § 314, p. 404.) The " 'mere possession by some official body of a continuing supervisory or investigatory power does not itself suffice to afford an administrative remedy unless the statute or regulation under which that power is exercised establishes *clearly defined machinery for the submission, evaluation and resolution of complaints by aggrieved parties.*' " (*Lance Camper Manufacturing Corp. v. Republic Indemnity Co., supra,* 44 Cal.App.4th at p. 199, italics added.)

■ This court found the exhaustion doctrine inapplicable when there was no statute or rule advising an aggrieved person how to apply for administrative relief. (*Henry George School of Social Science v. San Diego Unified School Dist.* (1960) 183 Cal.App.2d 82, 85 [6 Cal.Rptr. 661].) In *Martino v. Concord Community Hosp. Dist.* (1965) 233 Cal.App.2d 51 [43 Cal.Rptr. 255], the court found the exhaustion doctrine inapplicable when the hospital district had no procedure for the hearing or determination of a physician's grievance and its bylaws required it to only consider the matter. (*Id.* at pp. 56–57.) The court found there was no assurance the physician's grievance would be handled in any particular manner, and "[t]his nebulous procedure

cannot be deemed an adequate procedural remedy." (*Id.* at p. 57; see also 3 Witkin, Cal. Procedure, *supra,* Actions, § 314, pp. 404–406 and cases cited therein.)

██ Here, neither section 6061 nor the Committee's rules define any procedure for the submission, evaluation and resolution of refund claims. Accordingly, the State Bar does not provide an adequate administrative remedy and the exhaustion doctrine is inapplicable.[11]

## C

### *Written Disclosures for Continuing Students*

Additionally, Chapman contends that plaintiffs are not entitled to refunds of tuition under section 6061, because it requires that an unaccredited law school give students only a single disclosure statement when they matriculate, and does not require it to give continuing students additional statements each semester.

Section 6061 provides: "Any law school that is not accredited by the examining committee of the State Bar shall provide every student with a disclosure statement, *subsequent to the payment of any application fee but prior to the payment of any registration fee. . . .*" (Italics added.) Chapman asserts that because the statute refers to "disclosure statement" and "registration fee" in the singular, only one written disclosure is required. Chapman also asserts that because only prospective students pay application fees, the phrase "any registration fee" must refer only to first semester tuition. Plaintiffs assert the word "any" preceding "registration fee" means each semester's tuition.

██ Whenever possible we glean legislative intent from the words of the statute, giving them their usual, ordinary and commonsense meaning. (*Department of Fish & Game v. Anderson-Cottonwood Irrigation Dist.* (1992) 8 Cal.App.4th 1554, 1562 [11 Cal.Rptr.2d 222]; *Al-Sal Oil Co. v. State Bd. of Equalization* (1991) 232 Cal.App.3d 969, 976 [283 Cal.Rptr. 843].) " '[I]f

---

[11] Chapman points out that the Committee did consider the requests of two former students for assistance in obtaining refunds under section 6061. The Committee found Chapman failed to make required disclosures, but stated that "[i]n light of Chapman's offer of full refunds to [the students], the Committee will not require Chapman to refund all fees to [them]." The Committee did direct Chapman to strictly comply with disclosure requirements. We question the Committee's decision, given Chapman's condition of a full release of claims in exchange for a tuition refund. In any event, the Committee's conduct does not persuade us that the Legislature did not intend to confer a private right of action, or that the State Bar has a clearly defined procedure for prosecuting legitimate refund claims.

there is no ambiguity, then we presume the lawmakers meant what they said, and the plain meaning of the language governs.' " (*Allen v. Sully-Miller Contracting Co.* (2002) 28 Cal.4th 222, 227 [120 Cal.Rptr.2d 795, 47 P.3d 639].) However, we find section 6061 ambiguous, and thus we review the legislative history.

Adopted in September 1976, former Education Code section 29090 (Stats. 1976, ch. 1031, § 1, p. 4622) first set forth the requirement that an unaccredited law school provide students with written disclosure statements. Initially, the proposed statute stated "[t]his bill would require unaccredited law schools to make a disclosure statement to each student at least 10 days prior to the student's enrollment or the payment of *any* fees by the student." (Assem. Bill No. 3392 (1975–1976 Reg. Sess.) as introduced Mar. 9, 1976, italics added.) A committee report noted the "bill requires unaccredited law schools to provide *every student* with a disclosure statement." (Assem. Com. on Judiciary, Dig. of Assem. Bill No. 3392 (1975–1976 Reg. Sess.) Apr. 26, 1976, p. 1.)

The Assembly amended the statute to read the "disclosure statement required by this section shall be received by a student prior to payment of any *initial* registration fee." (Assem. Amend. to Assem. Bill No. 3392 (1975–1976 Reg. Sess.) April 22, 1976, some italics omitted.) However, the Assembly later amended the language to delete the word "initial." (Assem. Amend. to Assem. Bill No. 3392 (1975–1976 Reg. Sess.) May 3, 1976.) The Senate amended the statute three more times, but did not reinstate the word "initial." (See Sen. Amends. to Assem. Bill No. 3392 (1975–1976 Reg. Sess.) June 17, Aug. 16 & Aug. 25, 1976.) Former Education Code section 29090 required an unaccredited law school to "provide every student with a disclosure statement, subsequent to the payment of any application fee but prior to the payment of *any* registration fee." (Italics added.) That statute was renumbered in 1977 without substantive change to become former Education Code section 94360 (added by Stats. 1977, ch. 36, § 5, p. 88, repealed by Stats. 1986, ch. 1392, § 5, p. 4980), and section 6061 contains the same language as its predecessors.

The legislative history for former Education Code section 29090 does contain references to the disclosure requirement as applying to "prospective students." For example, it was noted that the "primary intent of this bill is to regulate unaccredited law schools by requiring them to disclose to prospective students their assets and liabilities, the passage rate for their students who take the bar exam, the size of the library, the qualifications of the faculty, and the ratio of faculty to students." (Assem. Ways & Means Com., 3d reading analysis of Assem. Bill No. 3392 (1975–1976 Reg. Sess.) as amended May 3, 1976.) However, the Legislature's removal of the word "initial" from the statute indicates it considered the issue of whether the disclosure requirement

applies to continuing students as well as prospective students, and decided to make disclosure a prerequisite to the collection of tuition for any semester. " '[T]he fact that the Legislature chose to omit a provision from the final version of a statute which was included in an earlier version constitutes strong evidence that the act as adopted should not be construed to incorporate the original provision.' " (*Beverly v. Anderson* (1999) 76 Cal.App.4th 480, 486 [90 Cal.Rptr.2d 545].)

Moreover, the Attorney General, who was designated to enforce former Education Code sections 29090 and 94360, interpreted the disclosure requirement to apply to continuing students, and in April 1977 he so informed unaccredited law schools. (See former Ed. Code, § 29093 [added by Stats. 1976, ch. 1031, § 1, p. 4622] renumbered to become § 94362 [added by Stats. 1977, ch. 36, § 547, p. 381, amended by Stats. 1993, ch. 8, § 52, p. 66], former § 29094 [added by Stats. 1976, ch. 1031, § 1, p. 4622] renumbered to become § 94363 [added by Stats. 1977, ch. 36, § 547, p. 381].) At the same time, the Attorney General told the legislation's author of that interpretation, after which the statute was not amended. Further, rule XX, section 3, of the Admission Rules provides: "The school shall, at the time of registration of each new student and prior to receipt of any fee or tuition for each semester, quarter or other academic period, from each returning student, provide the student with a correct disclosure statement." The administrative construction of a statute is entitled to weight unless a contrary legislative purpose is apparent. (*Pacific Legal Foundation v. Unemployment Ins. Appeals Bd.* (1981) 29 Cal.3d 101, 117 [172 Cal.Rptr. 194, 624 P.2d 244].) Here, the legislative history supports the administrative construction.

Chapman asserts the disclosure of specified information each semester serves no legislative purpose. We disagree, as continuing students would benefit by knowing, for example, the qualification of faculty members, the current status of any accreditation application and the percentage of students who passed the California bar examination after completing their studies. (§ 6061, subds. (c), (e) & (g).) The purpose of the disclosure requirement is to inform "all students [of] past success and viability of the school." (Cal. Dept. Finance, Analysis of Assem. Bill No. 3392 (1975–1976 Reg. Sess.) Sept. 8, 1976, p. 1.)

We conclude section 6061 requires an unaccredited law school to make enumerated disclosures before accepting any tuition or other fee, excluding an application fee. Accordingly, the court correctly directed a verdict for plaintiffs on their statutory claims.

D

*Unjust Enrichment*

Chapman also argues the refunds of tuition under section 6061 are improper under unjust enrichment principles. Chapman asserts the Legislature must not have intended to give students a "tremendous windfall" when they continued in school and obtained the benefit of a legal education notwithstanding the nondisclosures. In Chapman's view, a refund is available only when a student withdraws from school.

"[P]arties are required to include argument and citation to authority in their briefs, and the absence of these necessary elements allows this court to treat appellant's . . . issue as waived." (*Interinsurance Exchange v. Collins* (1994) 30 Cal.App.4th 1445, 1448 [37 Cal.Rptr.2d 126].) Even absent waiver, Chapman's argument lacks merit.

" ' "[O]ne person should not be permitted unjustly to enrich himself [or herself] at the expense of another, but should be required to make restitution of or for property or benefits received, retained, or appropriated, *where it is just and equitable that such restitution be made, and where such action involves no violation or frustration of law* or opposition to public policy, either directly or indirectly." ' " (*Dunkin v. Boskey* (2000) 82 Cal.App.4th 171, 195 [98 Cal.Rptr.2d 44], italics added.) By obtaining statutory refunds, students are not *unjustly* benefited.

E

*Substantial Compliance and Waiver Doctrines*

Further, Chapman contends strict compliance with section 6061 is not required, and it was the jury's province to determine whether it substantially complied with the statute. Citing the maxim "[t]he law disregards trifles" (Civ. Code, § 3533), Chapman asserts its violations of the statute were de minimis.

Substantial compliance with a statute "will suffice if the purpose of the statute is satisfied [citation] but substantial compliance means *actual* compliance in respect to that statutory purpose. [Citation.] The doctrine of substantial compliance excuses technical imperfections *only after the statutory objective has been achieved.*" (*Smith v. Board of Supervisors* (1989) 216 Cal.App.3d 862, 874–875 [265 Cal.Rptr. 466], second italics added.) For instance, courts have found substantial compliance when "a clerk merely failed to timely stamp an order for a new trial," and when there were

"harmless misstatements in a form contract." (*Id.* at p. 875.) Courts have also applied the substantial compliance doctrine to the Contractors' State License Law (Bus. & Prof. Code, § 7000 et seq.), to allow a contractor to recover for work performed when, for instance, its "license expired before completion of a project," or "following a change in the form of the contractor's business, the entity performing the contract was slightly different from the entity named on the contract." (*Asdourian v. Araj* (1985) 38 Cal.3d 276, 283 [211 Cal.Rptr. 703, 696 P.2d 95].)

Courts have held the substantial compliance doctrine is inapplicable when statutory notice requirements, including the time within which notice must be given, are not met. (*Smith v. Board of Supervisors, supra,* 216 Cal.App.3d at p. 876; *Ibarra v. City of Carson* (1989) 214 Cal.App.3d 90, 99 [262 Cal.Rptr. 485].) "It is a well settled rule that where the law prescribes the consequences that will follow the failure to do an act within a given time, the limitation is mandatory and not directory, and that the prescribed consequence cannot be defeated by performance of the act after the time allowed." (*Rosenfield v. Vosper* (1945) 70 Cal.App.2d 217, 223 [160 P.2d 842].)

Chapman states that "in adopting a statute intended for student protection, the Legislature did not intend the language to be taken so literally that a full tuition refund would be required if the disclosure statement erred in disclosing the number of books in the library by one or even ten volumes, or by misstating a professor's graduation date by a month or a year." However, a mere technical error is not at issue here.

Regarding the fall 1996 semester, Mann and Yeomans testified they did not receive a disclosure statement and Chapman concedes it could not produce any signed disclosure statements for them. During litigation Yeomans produced an unsigned copy of a disclosure statement, but it was obviously written after Chapman collected tuition for the fall 1996 semester, as it includes the passage rate of students who retook the FYLSX in *October* 1996 and states the law school "applied for [Committee] accreditation in *December* 1996." (Italics added.) Goehring signed a disclosure statement in August 1996, and he produced an unsigned copy of the statement during discovery. However, he testified Chapman did not give him a signed copy of the document as a receipt for his tuition payment. For the spring 1997 semester, Chapman concedes it gave no student a disclosure statement until well after it collected tuition.

The objective of section 6061 is to give prospective or continuing students notice *before they pay tuition* of the unaccredited law school's status so they may make informed decisions. Further, the statute requires a law school to give students signed copies of disclosure statements as a receipt for their

tuition, presumably as a means of demonstrating compliance. To any extent the substantial compliance doctrine may be applicable to section 6061, it is inapplicable here because Chapman's violations of section 6061 thwarted statutory objectives.

Similarly meritless is Chapman's contention, also unsupported by any legal authority, that plaintiffs waived refund claims under section 6061 by not asking Chapman for disclosure statements during the 1996–1997 academic year, continuing in law school after Chapman violated the statute and refusing to sign disclosure statements it belatedly provided weeks after collecting their tuition for the spring 1997 semester.

"A finding of waiver requires clear and convincing evidence of intentional relinquishment of a known right with awareness of the relevant facts. The waiver may be express, based on the party's words, or implied from conduct indicating an intent to relinquish the right." (*American Home Assurance Co. v. Societe Commerciale Toutelectric* (2002) 104 Cal.App.4th 406, 430 [128 Cal.Rptr.2d 430].) Chapman relies on an implied waiver theory, but the evidence it cites does not support such a finding.

F

*Statute of Limitations*

The court determined the one-year statute of limitations for an "action upon a statute for a penalty or forfeiture" (Code of Civ. Proc., § 340, subd. (a)) governs an action under section 6061. We agree.

" ' "[The] California Supreme Court has characterized as a penalty 'any law compelling a defendant to pay a plaintiff other than what is necessary to compensate him [or her] for a legal damage done him [or her] by the former.' " ' " (*G.H.I.I. v. MTS, Inc.* (1983) 147 Cal.App.3d 256, 278 [195 Cal.Rptr. 211], quoting *Miller v. Municipal Court* (1943) 22 Cal.2d 818, 837 [142 P.2d 297].) "A forfeiture is '[t]he divestiture of property without compensation' or '[t]he loss of a right, privilege, or property because of a crime, breach of obligation, or neglect of duty.' " (*Marin Healthcare Dist. v. Sutter Health* (2002) 103 Cal.App.4th 861, 877 [127 Cal.Rptr.2d 113].)

Plaintiffs point out that courts have applied a "remedial" versus "penal" test in determining the nature of statutory recovery. (See *Low v. Lan* (2002) 96 Cal.App.4th 1371, 1381 [118 Cal.Rptr.2d 60], citing *Willcox v. Edwards* (1912) 162 Cal. 455 [123 P. 276].) In *Low v. Lan,* the court held the three-year statute of limitations applies to a preference action under Insurance Code section 1034, because the action involves bona fide payments to

creditors, not fraudulent transfers, and there is no moral stigma attached to being the object of a preference claim. (*Low v. Lan, supra,* at p. 1375.) The court explained that while "a preference action arising out of a good faith transaction may seem like a forfeiture," it "is still *not* a 'forfeiture' as the term has been construed for purposes of the one-year statute." (*Id.* at p. 1381.)

In *Prudential Home Mortgage Co. v. Superior Court* (1998) 66 Cal.App.4th 1236, 1243, [78 Cal.Rptr.2d 566], the court observed the distinction between "remedial" and "penal" " 'is rarely clear cut, for the same provision may be penal to the offender and remedial to the victim.' " In *Prudential,* the court criticized its decision in *MacManus v. A. E. Realty Partners* (1983) 146 Cal.App.3d 275 [194 Cal.Rptr. 567], on which plaintiffs rely, for not "adhering to the long-standing application of Code of Civil Procedure section 340, [former] subdivision (1) to statutes awarding an arbitrary sum in addition to, *and unrelated to, actual damages,*" and instead "embark[ing] on the wrong analytical path" by "borrow[ing] the remedial versus penal test from *Huntington v. Attrill* (1892) 146 U.S. 657 [36 L.Ed. 1123, 13 S.Ct. 224]." (*Prudential, supra,* at p. 1243, italics added.) In *Prudential,* the court held the one-year statute of limitations is applicable to the violation of Civil Code section 2941, which "establishes the respective duties of the beneficiary and trustee with respect to the reconveyance of a deed of trust after the secured obligation is satisfied" (*Prudential,* at p. 1241), because Civil Code section 2941, subdivision (d) of the statute "compels a statutory violator to 'forfeit' the sum to the affected person, in addition to actual damages." (*Prudential,* at p. 1242.)

We conclude the general purpose of the refund provision of 6061 is penal in nature, as actual damage is not an element of the claim. Rather, to obtain a refund of tuition a plaintiff need only show the law school did not timely comply with disclosure requirements. Contrary to plaintiffs' position, the payment of tuition, standing alone, does not constitute actual damage. For instance, here the jury found that plaintiffs were not damaged by paying tuition to Chapman, and thus without section 6061 they would have no ground for the recovery of tuition. Moreover, the refund of fees is mandatory, and "[g]enerally, [Code of Civil Procedure] section 340, subdivision (a) applies if a civil penalty is mandatory." (*Shamsian v. Atlantic Richfield Co.* (2003) 107 Cal.App.4th 967, 978 [132 Cal.Rptr.2d 635].)

## DISPOSITION

The judgment is affirmed. The parties are to bear their own costs on appeal.

Huffman, J., and Aaron, J., concurred.

A petition for a rehearing was denied August 31, 2004, and the petition of plaintiffs and appellants for review by the Supreme Court was denied October 27, 2004.